[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Providence and Worcester Railroad Company (PWRCO), has appealed from a final decision of the defendant commissioner of transportation denying the railroad's petition to close permanently an at-grade crossing in the borough of Jewett City, which is situated in the town of Griswold. The plaintiff has raised three issues: (1) whether the commissioner had jurisdiction under General Statutes § 13b-270 to institute the proceeding that has resulted in an order to reopen the crossing at the sole expense of PWRCO; (2) whether the commissioner erred in concluding that the public safety requires that the crossing be kept open; and (3) whether the order that PWRCO maintain the crossing indefinitely, contrary to the terms of the easement between the railroad and the intervenor, Jewett City, constitutes a taking of private property and a denial of equal protection of the laws in violation of our federal and state constitutions. The court concludes that the commissioner did not lack jurisdiction because the proceeding was authorized by § 13b-270; that there was a sufficient basis for his conclusion that the public safety requires the crossing to remain in operation; and that the constitutional issues raised cannot be resolved in this administrative appeal but must be determined in some other proceeding.
There is no significant dispute about the subordinate facts, CT Page 6867 as distinguished from the inferences or conclusions drawn therefrom. On May 5, 1986, the commissioner, pursuant to General Statutes § 13b-26(f)(2), declared that an emergency condition existed in the borough of Jewett City because access to a residential area of the borough was severely restricted as a result of two state highway bridge replacement projects on Route 12. The commissioner concluded that a temporary at-grade railroad crossing was needed to provide access during the construction period. On May 22, 1986, the department of transportation (DOT), in behalf of the state of Connecticut, and PWRCO executed an easement agreement for the construction of a temporary crossing on South Main Street in Jewett City. The crossing was completed and placed in service on July 29, 1986. The easement agreement required the state to furnish liability insurance to protect PWRCO from any claims relating to the use of the crossing.
Delays in the bridge replacement projects made it necessary to seek extensions of the original term of the easement to June 5, 1989. In 1989 Special Act 89-32 was enacted, which provided that the South Main Street crossing "shall remain in use after the completion of repairs to Route 12." On April 27, 1990, PWRCO and Jewett City entered into an agreement granting to the borough an easement for the crossing for so long as the borough fulfilled its obligations as set forth therein and "so long as State or another party provides PW with a satisfactory policy of insurance covering liabilities associated with the crossing. In the event that either Borough fails to comply with this Agreement or said insurance is not provided, this easement will terminate." Although the easement given to the state had expired, DOT continued to provide liability insurance for the crossing until approximately four years thereafter.
By a letter dated June 4, 1993, however, DOT informed PWRCO and the town of Griswold that it would no longer provide insurance coverage for the crossing and that the existing policy would expire on July 1, 1993. On the latter date, PWRCO closed the crossing to vehicular traffic and sent a letter to DOT stating that it had done because the state had not renewed the insurance coverage and because Jewett City was unable to fund the policy. The letter referred to the provision in the easement agreement with Jewett City terminating the easement unless liability insurance for the crossing is furnished by the state "or another party." The letter also requested the state to "take whatever action is necessary to permanently close the. . . grade crossing." CT Page 6868
Viewing the PWRCO letter as a petition to close an at-grade crossing pursuant to § 13b-270, DOT ordered a public hearing thereon to be held at the Griswold town hall in Jewett City on October 5, 1993. The borough was granted party status. Relying on the evidence produced at the hearing, the commissioner found that the crossing was located on a main line track extending from Worcester, Massachusetts, to Groton, Connecticut, on which trains travel up to forty miles per hour two to four times per day; that closing the crossing would leave only one means of access for a community of 130 families and a twenty-four hour manufacturing plant, which employed 150 people; that the only other access was at the intersection of K of C Drive and Route 12, a heavily traveled state highway; and that, with the crossing closed, the remaining access would be inadequate in the event of an emergency, such as a fire, flood, or accident requiring emergency apparatus or evacuation of the area. There are no findings to indicate whether the closing of the crossing has made access any more troublesome than it was before the creation of the crossing in 1986. In the final decision denying the petition and ordering the crossing to be reopened, the commissioner concluded that "[p]ublic safety does not require the closing of the South Main Street at-grade railroad crossing."
I. Jurisdiction
In accordance with the provisions of General Statutes § 4-179, the commissioner issued a proposed decision prior to the final decision of June 13, 1994, in order to afford the opportunity for the parties to raise objections and to be heard upon them. During oral argument on the proposed decision and in its memorandum of law filed subsequently, PWRCO claimed that the commissioner's interpretation of its July 1, 1993 letter, notifying DOT that the crossing had been closed, as a petition to close the crossing pursuant to § 13b-270 was unwarranted, thus raising the issue of the subject matter jurisdiction of the commissioner to institute this proceeding. The final decision disposed of this claim by reciting the first sentence of the statutory text and declaring: "A clear reading of the statute shows that the Commissioner of Transportation has jurisdiction to order removal of a crossing or alterations in the at-grade crossing. It is within the sole and exclusive jurisdiction of the Department of transportation to determine that in the public safety it is necessary to open a railroad crossing. Therefore, PWRCO acted illegally by closing the crossing without prior approval of the Department."
The pertinent text relied upon provides: "The selectmen of any CT Page 6869 town. . . within which a highway crosses or is crossed by a railroad, or the directors of any railroad company whose road crosses or is crossed by a highway, may bring their petition in writing to the commissioner of transportation, alleging that public safety requires. . . the closing of a highway crossing and the substitution of another therefor, not at grade. . . and praying that the same may be ordered." That provision lends no support to the position of DOT that it was authorized to institute this proceeding in the absence of a proper petition. PWRCO maintains that its letter of July 1, 1993, was merely a notification to DOT that it had exercised its legal right to close the crossing in accordance with the terms of its easement agreements with the state and with Jewett City and could not reasonably be construed as a petition pursuant to § 13b-270. An additional claim of PWRCO that DOT lacked jurisdiction to order the crossing to be reopened because such an order violated its contractual rights under the easement agreements does not involve subject matter jurisdiction but relates only to the merits of the commissioner's decision.
Contrary to PWRCO's jurisdictional claim, its letter of July 1, 1993, did not merely inform DOT that it had closed the crossing in accordance with its contractual rights but also requested the state to "take whatever action is necessary to permanently close the . . . grade crossing." Although the letter was signed by a vice-president of the railroad rather than by "the directors", as § 13b-270 specifies, there is no claim that he was not authorized to act in behalf of the railroad. It was not unreasonable for DOT to regard the letter as a petition pursuant to that statute, because the procedure set forth therein was the only mechanism for legally closing a grade crossing, as PWRCO had requested. The court concludes that there is no merit to PWARCO's [PWRCO] jurisdictional claim.
II. Public Safety
PWRCO claims that the commissioner's conclusion that "[p]ublic safety does not require the closing of the South Main Street at-grade railroad crossing" is erroneous, but does not attack any of the factual findings on which that conclusion is based as unsupported by the evidence. Briefly summarized, those findings indicate that the loss of access provided by the crossing would require that a community of 130 families and a workforce of 150 employees of a manufacturing plant exit or enter that isolated area solely by means of a street that joins Route 12 at a point where the grade of the highway results in inadequate visibility of approaching traffic. The absence of any alternative access would CT Page 6870 be critical in the event of fire, flood or other emergency requiring evacuation of the area. A review of the record of the hearing demonstrates that the findings are sufficiently supported by the evidence.
PWRCO argues, nevertheless, that the commissioner's conclusion is erroneous because it is contrary to many judicial pronouncements the danger of grade crossings. "That every such crossing is a menace to human life is recognized, and repeated enactments, each supposed to be more stringent and effective to lessen the danger than former ones, have been passed." N. York N. Eng. R.R Co'sAppeal, 62 Conn. 527, 530 (1893) "It is true that grade crossings of highways by steam railroads have been repeatedly pronounced by this court to be dangerous to human life and that the general policy of the legislature for a considerable number of years has been to secure their abolition as speedily as it can reasonably be effected." N.Y., N.H. H. Co. v. Bridgeport Traction Co.,65 Conn. 410, 431 (1895) Despite these predictions of a century ago, grade crossings have not been eliminated and our statutes still permit the creation of additional ones in particular circumstances. General Statutes §§ 13b-267, 13b-268(b), 13b-270 Whatever may be the judicial view on the wisdom of grade crossings, it is clearly a legislative prerogative to determine whether such crossings may be allowed and to establish standards and procedures for their creation or their termination. If the legislature had deemed all grade crossings to be so inherently dangerous that none should be permitted, it would have enacted legislation so providing. Instead, it has chosen in § 13b-270 to impose on the applicant seeking to close such a crossing the burden of showing that public safety requires such action.
PWRCO also claims that the enactment in 1989 of Public Act No. 89-372, providing that "[o]n or after October 1, 1989, no public railroad crossing shall be constructed unless authorized by special act of the general assembly", supports its claim that the Jewett City crossing must be deemed incompatible with public safety. That legislation, however, does not apply to the Jewett City crossing, which was constructed and placed in operation in 1986. Furthermore, the 1989 legislative session that enacted the public act also enacted Special Act No. 89-32, which provides: "Notwithstanding any special provision of the general statutes, any special act or any regulation to the contrary, the railroad crossing at-grade over South Main Street in Jewett City shall remain in use after the completion of the repairs to Route 12. Such crossing shall be subject to the provisions of Sections 13b-342
CT Page 6871 to 13b-347, inclusive of the General Statutes." Whatever support the public act may lend to an inference that grade crossings inevitably endanger the public safety has been undercut by the exception provided for those created by special act, such as the Jewett City crossing.
Although the initial or proposed decision of the commissioner refers to the enactment of Special Act No. 89-32, it does not appear to rely on the declaration of the statute that the crossing "shall remain in use" after completion of the Route 12 construction project, but is based simply on the conclusion that public safety does not require closing of the crossing. The final decision, however, which repeats the findings and conclusions of the earlier decision, recites the text of the special act with reference to the taking claim of PWRCO and remarks: "The Department of Transportation must follow special acts of the legislature." That comment may be viewed as an alternative ground for the decision, as the commissioner claims in this appeal, but it does not vitiate the conclusion that PWRCO did not sustain its burden of proving that public safety requires closing of the crossing, the condition precedent prescribed by § 13b-270 for such an order. The court concludes that there is no infirmity in the commissioner's conclusion to that effect, which is a sufficient basis for the order to reopen the crossing.
III. Constitutional Issues
Finally, PWRCO claims that the action of the commissioner in ordering the crossing to be reopened abrogated the provision of its agreement with Jewett City that the crossing easement would terminate upon the failure to provide adequate liability insurance coverage and thus violated its federal and state constitutional rights with respect to equal protection of the laws and the taking of private property without just compensation. The commissioner as well as Jewett City maintain that those constitutional issues could not properly have been addressed by DOT in the administrative proceeding because such an agency lacks jurisdiction to consider them. They also contend that in this appeal the court is under a similar constraint because, under the Uniform Administrative Appeals Act (UAPA), judicial review is limited to determining whether the agency's decision is supported by substantial evidence and because the record of the hearing is inadequate for a determination of such questions.
In Caldor, Inc. v. Thornton, 191 Conn. 336, 343-44 (1983), the CT Page 6872 court upheld the refusal of the state board of mediation and arbitration to address the constitutionality of General Statutes § 53-303e(b), which provides that an employee's refusal to work on the day of the week that he observes as his Sabbath "shall not constitute grounds for his dismissal", even though the validity of the statute was among the issues submitted for arbitration. "The legislature cannot confer upon an administrative agency the power to adjudicate facial constitutionality without doing violence to the separation of powers doctrine." Id., 344 Thus, the commissioner properly refused to decide the constitutional claims raised by PWRCO.
The commissioner's contention that the standard of review of a decision of an administrative agency precludes consideration of PWRCO's constitutional issues, however, overlooks General Statutes § 4-183 (j)(1), which requires the reviewing court to determine whether the agency decision is "[i]n violation of constitutional . . . provisions." Implicitly that mandate recognizes the principle that constitutional issues should not be decided unless it is necessary for a proper adjudication of an appeal.Moore v. McNamara, 201 Conn. 16, 20-21 (1986) In Caldor, the court, after approving the refusal of the arbitrators to consider the constitutional issue, proceeded to make a determination of that issue that resulted in overturning their decision. In that case, however, the arbitrators had relied upon a statute whose validity was being challenged as violative of the first amendment, and the resolution of that issue was essential to a resolution of the appeal. In the present appeal, a determination that PWRCO's constitutional rights have been violated would not alter the conclusion of the commissioner, which the evidence supports, that public safety requires the grade crossing to be reopened. If that conclusion is sound, as this court has decided, it would be wholly inappropriate to close the crossing.
Furthermore, Special Act 89-32, providing that the crossing "shall remain in use after the completion of repairs to Route 12", constitutes a mandate that cannot be ignored, even if it involves a taking of property or other violation of PWRCO's constitutional rights. That enactment may well have been a legislative exercise of the state's power of eminent domain for the benefit of Jewett City residents and other members of the public. The absence of any provision for "just compensation" to PWRCO does not deprive the courts of the authority to make such an award in a proper proceeding. See Luf v. Southbury, 188 Conn. 336 (1982); Laurel,Inc. v. State, 169 Conn. 195, 200 (1975); General Statutes CT Page 6873 § 48-17b. No such award could have been made in the § 13b-270 proceeding that is the subject of this appeal, because the commissioner lacked jurisdiction to decide the constitutional issues involved and because the record is inadequate for a resolution of those issues and a determination of the damages that may be involved. Any such relief must await the institution of a proper proceeding by PWRCO.
It is ordered that judgment enter dismissing the appeal.
David M. Shea State Trial Referee